UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
ANTHONY BUCCI                 )
                              )
        Petitioner,           )
                              )
        v.                    )  CIVIL ACTION
                              )  NO. 09-10775-WGY
UNITED STATES                 )
                              )
        Respondent.           )
                              )
                              )
DAVID JORDAN¹                 )
                              )
        Petitioner,           )
                              )
        v.                    )  CIVIL ACTION
                              )  NO. 09-10787-WGY
UNITED STATES                 )
                              )
        Respondent.           )
                              )
```

MEMORANDUM AND ORDER

YOUNG, D.J.                                    December 31, 2009

I.   **INTRODUCTION**

     Pursuant to 28 U.S.C. § 2255, Anthony Bucci ("Bucci") seeks

to vacate his sentence due to alleged constitutional violations

during his trial and sentencing.  Bucci's Pet. [Doc. No. 398][2].

He presents five grounds for his relief.  Bucci's Mem. Supp. §

---

[1] Bucci's co-defendant David Jordan filed his own petition
pro se.  He primarily raises the courtroom closure issue
discussed infra.  His other grounds either track Bucci's or are
completely without merit.  Accordingly, this opinion will do duty
for both cases.

[2] Unless otherwise noted, all citations to docket entries
are found in the electronic docket for the Bucci-Jordan criminal
action, United States v. Bucci et al., No. 04-10194 (D. Mass.).

2255 Mot. ("Bucci's Mem.") [Doc. No. 400].  In Ground One, Bucci alleges that his right to a public trial was violated because the judge closed the courtroom to the public during jury empanelment. Bucci next claims that the prosecution violated its duty to disclose evidence exculpating Bucci, Ground Two, and committed other outrageous misconduct, Ground Three.  In Grounds Four and Five Bucci alleges ineffective assistance of counsel at the trial and sentencing proceedings.  The government denies each of these claims.  Government's Mot. Summ. Dismissal ("Gov.'s Mem.") [Doc. No. 413].

**A.   Procedural Posture**

Bucci was tried before a jury in the United States District Court in March 2006.  He was convicted on Counts 1, 2, and 5 (conspiracy to distribute cocaine, aiding and abetting, and possession with intent to distribute cocaine) as well as on Count 3 pursuant to 18 U.S.C. 924(c)(1)(A) (using or carrying a firearm during and in relation to a drug trafficking crime).  He was sentenced to a total of 252 months, 168 months on drug charges (Counts 1, 2, and 5) and a consecutive term of 84 months pursuant to 18 U.S.C. § 924(c)(1)(A) for the firearm charge (Count 3). Bucci's Mem. 88.  On appeal, Bucci's conviction and sentence were affirmed.  United States v. Bucci, No. 06-2746 (1st Cir. May 13, 2008) [Doc. No. 390].

**B.   Facts**

This case involves a number of drug dealers: Bucci, Jon Minotti ("Minotti"), Carlos Ruiz ("Ruiz"), and a corrupt police

2

officer David Jordan ("Jordan").  Bucci, unsatisfied with the
quality of drugs purchased from Ruiz, intended to steal drugs
from Ruiz, and needed assistance.  He approached Minotti, a long
time friend of Jordan.  The three planned to arrange a
transaction between Ruiz and Bucci with Minotti as a middleman.
When Minotti went to transfer three kilograms of cocaine from
Ruiz's car to Bucci's car, in accordance with the scheme, Jordan
arrived at the scene and identified himself as a Malden Police
Officer.  Jordan was in plain clothes and he pointed a gun at
Ruiz's head.  Minotti escaped with the narcotics, and both Ruiz
and Bucci were let go after Jordan frisked and questioned them.
Unbeknownst to Jordan, police were monitoring Ruiz's
transactions, and Jordan's involvement was soon discovered.

### C.    Federal Jurisdiction

This Court may exercise jurisdiction over Bucci's petition
for habeas corpus under 28 U.S.C. § 2255 because he is detained
pursuant to conviction and a sentence from a federal court.

## II.  ANALYSIS

### A.    Standard of review

Pursuant to 28 U.S.C. § 2255, a court may discharge or
resentence a defendant if it concludes that the sentence "was
imposed in violation of the Constitution or laws of the United
States, or that the court was without jurisdiction to impose such
sentence, or that the sentence was in excess of the maximum
authorized by law, or is otherwise subject to collateral attack."
28 U.S.C. § 2255(a).  As a general matter, claims not raised on

direct appeal may not be raised on collateral proceedings such as a petition pursuant to 28 U.S.C. § 2255, unless the petitioner shows cause that excuses the procedural default, and actual prejudice that resulted from the alleged error.  United States v. Frady, 456 U.S. 152, 167 (1982).  "The habeas petitioner must show 'not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"  Murray v. Carrier, 477 U.S. 478, 494 (1986) (citing Frady, 456 U.S. at 170).

   **B.   Bucci's claims**

      1.   Courtroom closure (Ground One)

Bucci claims that the exclusion of some of his family and friends from the courtroom during jury empanelment violated his Sixth Amendment right to a public trial.  Because Bucci procedurally defaulted on this Sixth Amendment claim, he must normally show cause and actual prejudice.  Frady, 456 U.S. at 167-68.  If, however, a total closure of the courtroom occurred without sufficient justification as Bucci contends, this would constitute "structural error," relieving Bucci of the burden to show actual prejudice.  Owens v. United States, 483 F.3d 48, 64 (1st Cir. 2007) ("[A] defendant who is seeking to excuse a procedurally defaulted claim of structural error [such as failure to hold a public trial] need not establish actual prejudice.").

While there is no record of courtroom closure in the official trial transcript, Bucci alleges - and the government

4

does not deny - that on the morning of March 20, 2006, the courtroom was cleared of spectators to make way for the jury venire and not all members of the public were allowed back in that morning.  This Court held an evidentiary hearing over the course of three days better to determine the course of events as they unfolded during the first day of Bucci's trial.  During the hearing, the Court heard the testimony of witnesses present on March 20, 2006, including some members of Bucci's friends and family, the courtroom deputy clerk assigned to Judge Reginald Lindsay ("Judge Lindsay"), the official court reporter for the session, the jury commissioner, and Bucci's trial lawyers.  This Court finds the following facts:[3]

  a.  Findings of fact

    Jury empanelment for the Bucci-Jordan criminal trial was scheduled to take place on Monday, March 20, 2006.  Judge Lindsay, who was wheelchair bound, presided over the trial in Courtroom 11 of the John Joseph Moakley Courthouse.  Courtroom 11 was and still is the only courtroom in the building equipped with a lift that enabled Judge Lindsay to get onto the bench.  The public area in Courtroom 11 has fourteen benches, each of which seat four people comfortably, for a normal capacity of fifty-six

---

[3] The Court delivered its findings of fact from the bench on the last day of the evidentiary hearing.  This is a salutary practice as the testimony is fresh and vivid in the judge's mind. It also serves to move a case forward expeditiously.  In the main, the factual findings set forth here simply re-state, in more readable form, the Court's findings made from the bench.  In certain respects, however, they are different in light of a careful review of the transcripts of the hearing and the trial. Each difference is distinctly noted in the text.

persons.  Hr'g Tr. vol. 3 at 15.  Prior to March 20, realizing
that this trial involved two defendants, one of whom was a police
officer, Courtroom Deputy Clerk Lisa Hourihan ("Ms. Hourihan")
arranged to obtain a larger venire than usual.  After a
discussion with Judge Lindsay, Ms. Hourihan ordered sixty-five
jurors.  Hr'g Tr. vol. 1 at 12-13; Hr'g Tr. vol. 3 at 5.

On March 20, 2006, the Official Court Reporter for the
session Deborah Joyce ("Joyce"), as was her routine, unlocked the
doors of the courtroom prior to 9:00 a.m.  Hr'g Tr. vol. 1 at 92-
93.  Once the doors were unlocked, various members of the public
including, Bucci's mother, Rosemarie Keefe ("Mrs. Keefe");
Bucci's wife, Melissa Bucci("Mrs. Bucci"); Jordan's wife ("Mrs.
Jordan"), Michael Kevin Dupont[4] ("Dupont"); other members of the
defendants' family and friends; and a few other spectators, took
seats in the public area of the courtroom.  Id. at 18-19, 95-96;
Hr'g Tr. vol. 2 at 13-14; Bucci's Mem., Ex. 7.  Between the time
that the doors opened and the time that the jury venire was
brought to the courtroom, counsel for the government and the
defendants as well as the courtroom staff went about setting up
for the proceedings.  Judge Lindsay was not present in the

---

[4] Dupont was a well-known and frequent pro-se litigant in
Judge Lindsay's session.  On this occasion, the Bucci family had
hired Dupont to take notes for them and provide his insight
during the trial.  Hr'g Tr. vol. 1 at 128.  Bucci's counsel,
however, had no relationship to Dupont and did not confer with
Dupont with respect to Bucci's representation.  Hr'g Tr. vol. 2
at 68.  The supreme irony of these cases is that, as will be seen
below, it is Dupont's conduct which forestalled a closure of the
courtroom and the "structural error" that would have voided these
convictions.

courtroom and he did not enter the courtroom at any time before the jury venire was already present.  Hr'g Tr. vol. 1 at 15, 17, 99; Hr'g Tr. vol. 3 at 28.

When the Jury Commissioner notified Ms. Hourihan that the venire was ready to come up to the courtroom, there were approximately twelve to twenty-five spectators seated in the public area.  Realizing that there would hardly be room for the sixty-five potential jurors as the courtroom comfortably sat fifty-six persons, Ms. Hourihan asked spectators sitting in the public area to clear the courtroom to make way for the jury. Hr'g Tr. vol. 1 at 17-18, 94.  As the public exited the courtroom into the hallway, Dupont told Ms. Hourihan that Bucci's family members had a right to be present for the jury selection.  Id. at 19-20.  Ms. Hourihan then went out through the back doors of the courtroom and consulted Judge Lindsay.  Id. at 20, 96. Afterwards, Ms. Hourihan cleared a bench in the first row on the left side of the courtroom (facing towards the bench), which was usually kept vacant because the audio/video podium blocked it from the judge's line of sight.  Id. at 20.  Ms. Hourihan went out into the hallway and invited Mrs. Keefe, Mrs. Bucci, and Mrs. Jordan to come back in and sit at this bench in the first row. Id. at 21, 96-97; Hr'g Tr. vol. 3 at 23; Hr'g Tr. vol. 2 at 98.

While Mrs. Keefe, Mrs. Bucci, and Mrs. Jordan took their seats, the venire lined up outside the courtroom in the order their names had randomly been placed on the jury list, as was the practice of the session.  Hr'g Tr. vol. 3 at 6.  Shortly

thereafter, they were brought into the courtroom and filled in the remaining benches, preserving the order in which they had lined up.[5]  The venire sat shoulder to shoulder, five persons to a bench rather than the usual four, given that there were thirteen benches left and sixty-five venire members.  Ms. Hourihan then called the court to order, Judge Lindsay came onto the bench, and the proceedings began at 10:40 a.m., at which time the official transcript also begins.  Trial Tr. Jury Trial Day One, 1, March 20, 2006.  This Court explicitly finds that the record maintained by Joyce was a complete and accurate record of the events in court starting at 10:40 a.m. that day.

The record reflects that, as was Judge Lindsay's practice, he first conducted a voir dire of the entire panel.  Those who answered affirmatively to any of his questions stood up, stated their names, and sat back down.  Ms. Hourihan then filled the jury box with the first twelve venire members on the jury list, and those who had answered affirmatively to any of the voir dire questions proceeded one by one from the jury box to sidebar for further questioning.  Next, Judge Lindsay excused jurors whom he determined not to be indifferent, and those excused jurors left the courtroom.  After there were twelve indifferent persons in the jury box, counsel exercised their peremptory challenges and those jurors excused left the courtroom as well.  More venire

---

[5] Judge Lindsay employed this practice - one that benefits both the defense and the government - of seating venirepersons in the order their names appeared on the jury list so that counsel could discern which succeeding members would replace the most recently excused jurors.

members then filled the jury box in place of those excused, and
the process was repeated until a jury was selected.[6]  See Hr'g
Tr. vol. 1 at 26-27.

It was not until approximately 11:40 a.m. that the first
juror who had been excused for cause left the courtroom.  Trial
Tr. 31; Hr'g Tr. vol. 3 at 10 (Jury Commissioner testifying that

---

[6] The great legal philosopher Lon L. Fuller praised the
adversary system as the system most effective at preventing a
fact-finder from determining things unknown on the basis of what
the fact-finder already knows.  L. Fuller, The Forms and Limits
of Adjudication, 92 Harv. L. Rev. 353, 383 (1978).  As fact-
finder in this case, I acknowledge that I am intimately familiar
with the layout of Courtroom 11, having sat there on a variety of
occasions.  Moreover, I myself empanel juries following a
protocol much like that followed by Judge Lindsay here.
This familiarity led me to make an erroneous initial factual
finding of more than marginal significance.  In my initial
findings and rulings, I said that allowing more spectators back
into the courtroom at any time during empanelment would have
resulted in such spectators "sitting in and among the venire."
Hr'g Tr. vol. 3 at 96.  This is erroneous.  I came to this
conclusion because it is my practice to deal with the challenges
for cause before filling the box and I assumed (erroneously) that
Judge Lindsay empanelled in the same fashion.
A close review of the hearing transcript, however, convinces
me that is not the way Judge Lindsay empanelled.  As mentioned
above, he would first fill the jury box, then excuse jurors for
cause, and replace them with jurors next in line.  Hr'g Tr. vol.
1 at 26-27.  This method results in spectator benches being
emptied sequentially from front to back.
Thus had spectators been allowed back into the courtroom,
they could have been seated in empty benches in front of the
remaining venirepersons, rather than "among" the venire.
Spectators might, therefore, have filled those benches, bench by
bench, sitting no closer to the venire than the bench occupied by
Mrs. Bucci, Mrs. Keefe, and Mrs. Jordan.
Still, admitting spectators bench by bench as benches became
vacant would greatly have increased the risk of inappropriate
interaction between the venire and the spectators.  Moreover, it
would have interposed two rows of spectators between the
remaining venire and the sight lines of counsel and Judge
Lindsay, thus markedly decreasing the value to counsel derived
from closely observing the potential jurors most likely to next
be called to sit.

generally, the first juror did not return to the jury assembly room from Judge Lindsay's courtroom until an hour or an hour and fifteen minutes after jury selection began).  From that time until the lunch recess at 1:15 p.m., twenty[7] more jurors were excused and left the courtroom.  Trial Tr. 51-86.  Thus, from 11:40 a.m. to 1:15 p.m., a total of twenty-one jurors left the courtroom.

As jury selection proceeded inside the courtroom, one to two court security officers (the "Court Officers") stood outside the double doors.  The doors remained unlocked throughout the day. Hr'g Tr. vol. 1 at 57-58, 92.  From 10:40 a.m. until the lunch recess at 1:15 p.m., however, the Court Officers observed in good faith Ms. Hourihan's earlier direction for the public to clear courtroom, and denied entry to anyone who attempted to enter the courtroom.  As some witnesses testified, one or both of the Court Officers also said that the courtroom was closed for empanelment all day.  See, e.g., Hr'g Tr. vol. 2 at 148.  Although not all persons initially asked to clear the courtroom sought reentry, some of Bucci's family members arriving later that morning, including Bucci's daughters and aunt, did request entry and were denied.  Id. at 130-131, 148.  Thus, while twenty-one jurors exited the courtroom between 11:40 a.m. and 1:15 p.m., the Court Officers continued to prohibit spectators from entering the courtroom.

--------

[7] The Court's initial fact-finding was "19," Hr'g Tr. vol. 3 at 91.  An actual count of excused jurors from the trial transcript yields "20."

At approximately 1:15 p.m., when the court took a lunch recess, Judge Lindsay expressly admonished counsel to ensure that the defendants and their family members did not mingle with jurors during lunch.  Trial Tr. 85-86.  He then released the venire through the public doors and Mrs. Keefe, Mrs. Bucci, and Mrs. Jordan left the courtroom as well.  Sometime prior to 2:15 p.m., when the lunch recess was scheduled to end, counsel, the defendants, and others including Mrs. Keefe and Mrs. Bucci reentered the courtroom through the unlocked double doors.  At approximately 2:15 p.m., jury selection resumed and proceeded until approximately 2:40 p.m.  Trial Tr. 86-102.  This Court finds that after the court recessed for lunch around 1:15 p.m., there were no further efforts by any court personnel to bar entry into the courtroom.  Indeed, there is no evidence that anyone attempted to enter and was denied entry after 1:15 p.m.  Therefore, the only issue raised by Bucci's closure argument ends as of the lunch recess at 1:15 p.m.

   b.   Analysis

"A defendant has a right to a trial that is open to members of the public."  Owens v. United States, 483 F.3d 48, 61 (1st Cir. 2007) (citing Waller v. Georgia, 467 U.S. 39, 46 (1984)).  The public trial guarantee benefits the defendant as it discourages perjury, encourages witnesses to come forward, and ensures that the judge and prosecutor carry out their duties responsibly.  Waller, 467 U.S. at 46 (internal citations omitted).  See Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 383

(1979) ("Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward . . . , cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system."); In re Oliver, 333 U.S. 257, 270 (1948) ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power."). As the First Circuit has recognized, the public trial guarantee applies with full force to jury selection as it is "one of the most important phases of a criminal trial." Owens, 483 F.3d at 64. The watchful public eye encourages jurors to be forthcoming about biases and past experiences, and encourages both parties to pick an impartial jury. Id. at 65.

Given the importance of an open courtroom, trial closures excluding the public should be "'rare and only for cause shown that outweighs the value of openness.'" Id. at 61 (quoting Press-Enterprise Co. v. Superior Court of Cal., 464 U.S. 501, 509 (1984)). In particular, a trial closure may be justified only when: there is an overriding interest and closure is essential to preserve higher values; the closure is narrowly tailored to serve the overriding interest; the court has considered alternatives to closure; and there are specific findings to enable a reviewing court to determine whether closure was proper. Waller, 467 U.S. at 45; Owens, 483 F.3d at 61-62. In this case, Bucci alleges that the district court failed to comply with the Waller

12

requirements before closing the courtroom on the first day of the trial.  In particular, Bucci alleges that the district court did not make specific findings as to an overriding interest, and neglected to consider alternatives to courtroom closure.  Bucci's argument fails, however, because this Court holds that no closure occurred, and thus the trial court was not required to comply with <u>Waller</u>.

First, no closure occurred the morning of March 20, 2006 when Courtroom Deputy Clerk Hourihan initially cleared the courtroom of at least twelve to twenty-five spectators to make space for the jury venire, and subsequently invited back in only three members of the defendants' families.  "A public trial implies only that the court must be open to those who wish to come, **sit in the available seats**, conduct themselves with decorum, and observe the trial process."  <u>Estes</u> v. <u>Texas</u>, 381 U.S. 532, 589 (1965) (emphasis added).  At the commencement of Bucci's jury selection, there were sixty-five persons in the venire, more than could sit comfortably in the courtroom's public area; thus, Ms. Hourihan, as was customary, asked the public to exit the courtroom.  When Dupont protested to the absence of Bucci's family members, however, the court reasonably accommodated the defendants' closest family members.  After the venire filled in the remaining thirteen benches, there was in essence no available seating remaining, and three members of the

13

public were present when jury empanelment began.[8]  Hr'g Tr. vol.
3 at 23.  That other members of the public were not allowed into
the courtroom does not amount to a closure implicating the Sixth
Amendment.  Estes, 381 U.S. at 588-89 ("Obviously, the public
trial guarantee is not violated if an individual member of the
public cannot gain admittance to a courtroom because there are no
available seats.  The guarantee will already have been met, for
the 'public' will be present in the form of those persons who did
gain admission.").  See Owens v. United States, 517 F. Supp. 2d
570, 575 n.7 (D. Mass. 2007)  (Gertner, J.) ("The [trial court's]
closure did not necessarily become constitutionally significant
at the point when spectators were asked to leave . . . but rather
when they were not permitted to return after some jurors were
excused.").

The more difficult question is whether a closure occurred
when outside the courtroom, the Court Officers - unbeknownst to
Judge Lindsay and Ms. Hourihan inside the courtroom - continued
to prohibit members of the public from entering the courtroom
even as seats became available.  Throughout the morning, between
approximately 11:40 a.m. and the 1:15 p.m. lunch recess, twenty-
one venire members were excused and left the courtroom one by
one, but the Court Officers continued to deny entry.  Bucci

---

[8] The Court notes that a bench in Courtroom 11 sits four
persons comfortably and could have squeezed in five.  Thus, to be
completely precise, the court could have allowed one to two more
spectators to sit with Mrs. Bucci, Mrs. Keefe, and Mrs. Jordan.
It is, however, of no constitutional moment that the court did
not do so.

argues that the actions of the Court Officers defy the holding of
Owens.  There, the defendant alleged a violation of his public
trial right when the court cleared the courtroom of spectators to
make way for the jury and did not allow any members of the public
to enter even as jurors exited.  The First Circuit held that a
defendant's right to a public trial would indeed be violated if
the trial court excluded all members of the public for the
entirety of jury empanelment without complying with Waller.
Owens, 483 F.3d at 63.  In Owens, the trial court did not make
findings on the record justifying the continuing exclusion of the
public even as venire members began to leave.  The First Circuit
stated, "[o]nce there was sufficient space in the courtroom, we
see no state interest . . . in not permitting Owens' family,
friends, or other members of the public to observe the
proceedings."  Id. at 62.

     The present case, however, is distinguishable from Owens on
at least one principal ground.  In Owens, the First Circuit
believed that **no** members of the public were present for the
**entire day** of jury selection.  Here in contrast, members of the
public - specifically, Mrs. Keefe, Mrs. Bucci, and Mrs. Jordan
who likely were the most invested spectators - **were** present,
keenly casting their watchful eye upon the entirety of the
empanelment.[9]  This Court holds that in light of the public

---

[9] Indeed, Mrs. Keefe - whose testimony showed her to be a
devoted mother who carefully followed every moment of the trial,
talked to her son every day during his incarceration, and even
led the effort to collect affidavits for Bucci's habeas petition

presence during jury selection and the trial judge's power to place reasonable time, place, and manner limits on trial access, the fact that other spectators were not allowed to fill the seats of the excused jurors throughout the morning does not violate Bucci's constitutional right to a public trial.

The First Circuit's recent holding in United States v. Scott, 564 F.3d 34 (2009), is instructive.  In Scott, the defendant alleged that his right to a public trial was violated when the court barred members of the public from entering or leaving the courtroom during the jury charge.  The First Circuit noted that the trial court announced to then-present spectators that they were welcome to stay in the courtroom during the charge but they would not be permitted to leave, "presumably to avoid distracting the jury during the . . . charge."  Id. at 37-38. Distinguishing the case from Owens, the court held that no closure had occurred because the "public was indeed present at the jury charge and with its presence cast the sharp light of public scrutiny on the trial proceedings, thus providing the defendant with the protections anticipated by the public trial provision of the Constitution."  Id. at 38 (citing Herring v. Meachum, 11 F.3d 374, 379-80 (2d Cir. 1993)).  The court went on to state, "that a hypothetical member of the public who arrived

_____

- was likely the most important member of the public to be present from Bucci's perspective.  Hr'g Tr. vol. 2 at 30, 33.

16

late . . . might have been barred from the proceedings does not undermine the public nature of the proceedings."[10]  Id. at 38.

The holdings in Scott and similar cases are in line with the trial judge's inherent power to "impose reasonable limitations on access to a trial" to ensure the fair and efficient administration of justice.  Press-Enterprise, 464 U.S. at 510 n.10 (citing Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581 n.18 (1980)); Scott, 564 F.3d at 38-39 (praising trial court for preserving defendant's right to a public trial "while also facilitating the orderly and efficient functioning of the courtroom").  See also Meachum, 11 F.3d at 380 ("Reasonable time, place, and manner limitations on access to the courtroom are permitted to ensure the fair and efficient administration of justice."); Snyder v. Coiner, 510 F.2d 224, 230 (4th Cir. 1975) (holding that judge had power to limit ingress and egress of

---

[10] Other jurisdictions that have considered this issue have also held that prohibiting public ingress and egress during a jury charge does not constitute "closure" under the Sixth Amendment.  E.g., Herring v. Meachum, 11 F.3d 374, 380 (2d Cir. 1993) (holding that trial was never "closed" when court locked doors during jury charge because all members of the public who wanted to observe the charge were permitted to do so if there was enough space and they arrived in time); Bell v. Evatt, 72 F.3d 421, 433 (4th Cir. 1995) ("[A] defendant's right to a public trial is not implicated by temporary limitation of ingress and egress to the courtroom to prevent disturbance of the proceedings."); Commonwealth v. Dykens, 438 Mass. 827, 835-36 (2003) (holding that no closure occurred when judge did not allow anyone to enter or leave courtroom during jury instructions); Commonwealth v. Hartman, 536 Pa. 211, 218 (1994) (holding that no closure occurred where judge locked doors to ensure jury would not be distracted); Davidson v. State, 591 So. 2d 901, 902-903 (Ala. Crim. App. 1991) (same).

persons during counsels' final arguments because it was a
reasonable limitation to prevent disturbance).

In Bucci's case, as in the jury charge cases, members of the
public filled the available seats in the courtroom and were
present, casting the "sharp light of public scrutiny" upon the
entirety of the jury empanelment.  The exclusion of other members
of Bucci's family and friends throughout the morning even as
seats became available does not undermine the public nature of
that empanelment.  See Scott, 564 F.3d at 38 (ruling that while
the barring of hypothetical late-arriving members of the public
might have implications for the barred individual's right of
access, it has no bearing on the public nature of the
proceedings).  The presence of the defendants' closest family
members vindicated their public trial rights by ensuring that the
defendants were "fairly dealt with and not unjustly condemned"
and by "keep[ing] [the defendants'] triers keenly alive to a
sense of their responsibility and to the importance of their
functions."  See Waller, 467 U.S. at 46 (internal citations
omitted).  Indeed, who better to perform that function for Bucci
than Mrs. Keefe and Mrs. Bucci?

Moreover, disallowing public entry throughout the
empanelment was a reasonable exercise of the judge's power to
ensure fairness and order during the proceedings because it
lessened the risk of intermingling between potential jurors and
the defendants' close family members.  Judge Lindsay's concern
regarding the inappropriate interaction between the venire and

spectators is implicit in the record, see Hr'g Tr. vol. 1 at 59, and expressly exhibited by the judge's admonition before the lunch recess for counsel to ensure that the defendants' families did not mingle with venire members, Trial Tr. 31.[11]  As the affidavits submitted by Bucci and the testimony at the evidentiary hearing show, there were at least twenty-five of Bucci and Jordan's close family members and friends, waiting around the entrance to the courtroom at various points throughout the morning.  They included the defendants' siblings, children, aunt, uncles, cousins, nieces, and nephews.  See Bucci's Pet., Ex. 7; Hr'g Tr. vol 2 at 14, 85-88, 98-99, 101-102.  Allowing such a large number of close family members to sit in the immediate proximity of the potential jurors would have increased the risk of improper mingling.  In addition, as mentioned above, allowing spectators immediately to take the seats of the excused jurors in the first and second rows would block Judge Lindsay's and counsels' view of the venirepersons next in line to fill the jury box.  This would significantly diminish the benefit of Judge Lindsay's practice of seating jurors in the courtroom according to the order they would be called to the jury box.  See supra Part II.B.1.a., n.5.  Therefore, it was within Judge Lindsay's

---

[11] It appears Judge Lindsay's concern was well-founded as Mrs. Keefe testified that during the lunch recess, a venire member indeed attempted to speak with her.  To Mrs. Keefe's credit, she immediately told the potential juror that per the judge's instructions, she could not speak to him.  Hr'g Tr., vol. 2 at 26.

discretion reasonably to limit access to the trial throughout the morning.

Furthermore, a record of the jury selection was made available for public viewing after the proceeding, which cuts against any air of secrecy.  This case is a far cry from that in Waller, where no members of the public were admitted for a seven-day suppression hearing, 467 U.S. at 48, or that in Owens, where the First Circuit believed that all spectators were excluded from the entire day of jury selection, 483 F.3d at 63.  There having been no closure for the reasons stated above, this Court holds that Bucci's right to a public trial was not violated, and thus he cannot prevail on this ground of his habeas petition.

2.    Prosecutorial misconduct (Grounds Two and Three)

Bucci alleges in Ground Two of his petition that his Due Process rights were violated because the government failed to make appropriate disclosure of favorable evidence as mandated by Brady v. Maryland, 373 U.S. 83 (1963).  Specifically, Bucci claims that the government withheld an affidavit prepared by Minotti ("Minotti Aff."), Bucci's Mem., Ex. 15 [Doc. No. 400, Ex. 1, Part 4 at 15], for Minotti's sentencing hearing as well as statements made by Minotti during his proffer sessions.  Bucci's Mem. 18.

This issue was not raised during the direct appeal.  The government argues that Bucci's claim is procedurally barred because he has failed to show cause and prejudice as required by Frady, 456 U.S. at 167-68.

Minotti's Affidavit relates to the possibility that during the set up narcotics transaction Ruiz carried a gun.  Minotti stated that he told Jordan that Ruiz never had a gun.  Minotti therefore never actually thought that Jordan would even consider pulling his service weapon.  Minotti Aff. 4.  While this statement is relevant to whether Minotti actually foresaw that Jordan would carry a gun, it is irrelevant to whether Bucci foresaw the same.  Minotti's Affidavit is thus immaterial as to Bucci's guilt and punishment, and Bucci is unable to show that the jury and sentencing judge's lack of knowledge regarding the conversation between Minotti and Jordan worked to Bucci's actual and substantial disadvantage.  No prejudice existed and this Court's inquiry need not go any further.[12]

Moreover, in Ground Three, Bucci alleges various misconduct by the prosecution.  He suggests that the government coerced Minotti into pleading guilty to the gun charge pursuant to 18 U.S.C. § 924(c)(1), conducted direct examination in a manner that

---

[12] It seems fair to note, however, that Bucci also fails to show cause for his procedural default.  Bucci explains that at the time of his sentencing, he was not aware of the existence of Minotti's affidavit, Bucci's Pet. 7, because it was sealed and unavailable to his counsel.  Bucci's Mem. 15.  An examination of docket entries in United States v. Minotti, No. 04-10325 (D. Mass.), shows the contrary.  The affidavit was filed on July 11, 2006.  [No. 04-10325, Doc. No. 66].  On the same day Minotti moved to seal the Affidavit.  [No. 04-10325, Doc. No. 67].  On July 14, 2006, Judge O'Toole issued an electronic order denying Minotti's motion.  The government correctly points out that on that day the Affidavit became a part of public record and was accessible to Bucci's counsel.  Gov.'s Mem. 23.  Bucci fails to show otherwise.

manipulated the truth, and failed to disclose evidence which could impeach Minotti.

Again, those claims were not brought up during the direct appeal. Bucci fails to show that any prejudice resulted. Thus, whether there was cause for Bucci's procedural default need not be analyzed.

> 3. Ineffective assistance of counsel (Grounds Four and Five)

When the underlying claim alleges ineffective assistance of counsel the requirement of showing cause and prejudice for a procedural default does not apply. Smullen v. United States, 94 F.3d 20, 23 (1st Cir. 1996) (citing Knight v. United States, 37 F.3d 769, 774 (1st Cir. 1994)). "Constitutionally ineffective assistance of counsel constitutes cause sufficient to excuse a procedural default." Prou v. United States, 199 F.3d 37, 47 (1st Cir. 1999) (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate deficient performance of counsel and prejudice resulting therefrom. Strickland v. Washington, 466 U.S. 668, 687 (1984). Such deficiency occurs when an attorney's performance is "so inferior as to be objectively unreasonable." United States v. McGill, 11 F.3d 223, 226 (1st Cir. 1993). The Constitution guarantees a "fair trial and competent attorney," Engle v. Isaac, 456 U.S. 107, 134 (1982), and not a "successful defense," United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991). An attorney's assistance is ineffective where he fails to "raise an important, obvious defense without any imaginable

strategic or tactical reasons for the omission." <u>Prou</u>, 199 F.3d
at 48.  To show the resultant prejudice, "[t]he defendant must
show that there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding
would have been different.  A reasonable probability is a
probability sufficient to undermine confidence in the outcome."
<u>Strickland</u>, 466 U.S. at 694.

>        a.   Witness issues at the trial

In Ground Four, Bucci alleges that in the opening statement
his counsel promised the jury that he would present a witness
with an alibi defense, and that counsel then failed to call that
witness, undercutting the credibility of the defense.  Bucci's
Mem. 77.

The determination of whether a failure to produce a promised
witness constitutes ineffective assistance is necessarily fact-
based.  <u>McGill</u>, 11 F.3d at 227.  "[N]o particular set of rules
can be established to define effective assistance, as hard-and-
fast rules would inevitably restrict the independence and
latitude counsel must have in making tactical and strategic
decisions."  <u>Natanel</u>, 938 F.2d at 310.

The government contends that when the prosecution rested,
Bucci's attorney made an offer of proof and the government did
not object.  Trial counsel sought a brief recess to confer with
his client.  After the recess, trial counsel said he would not be
calling any witnesses.  Gov.'s Mem. 39.  The government argues
that the decision not to call the alibi witness was strategic.

There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689 (internal citation omitted).   Here, Bucci has not carried his burden of proving that the decision was not strategic.[13]

Next, Bucci alleges that the fact his attorney previewed the government's cooperating witness whom the government ultimately decided not to call amounted to ineffective assistance of counsel.   Bucci, however, presents no evidence that trial counsel knew or should have known that the government would not call that witness.   The government points out that the prosecution only decided in the middle of its case not to call the cooperating witness, and that co-defendant's counsel previewed the same witness.

Finally, Bucci contends that trial counsel rendered deficient performance by failing to lay the foundation for and

---

[13] Moreover, Bucci's claim is easily distinguishable from the First Circuit precedent finding ineffective assistance of counsel when counsel failed to present evidence mentioned in an opening.   In Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir. 2002), the First Circuit held that a decision to not have the defendant testify after promising his testimony in an opening was deficient performance.   The First Circuit has noted, however, that this holding is limited to cases with "greater specificity in the promise and greater contemporaneousness between the promise and jury deliberations," Yeboah-Sefah v. Ficco, 556 F.3d 53, 78 (1st Cir. 2009) (quoting Phoenix v. Matesanz, 233 F.3d 77, 85 (1st Cir. 2000)), than what transpired here.   In Bucci's case counsel did not name the witness and the alibi was circumstantial in nature.   Further, the opening took place twenty days prior to deliberations.

offer the testimony of another government witness's brother, who purportedly was willing to impeach the government witness's testimony.  The potential impeachment witness was called but was excluded under Federal Rule of Evidence 403 (excluding relevant evidence on grounds of prejudice, confusion, or waste of time).  The prosecution's witness had already been cross-examined for several days and the witness was deemed redundant by the court.

Bucci is not able to show that his counsel's performance was so deficient that it deprived him of trial producing a fair result.

b.   Ineffective assistance at the sentencing

In Ground Five, Bucci claims that his counsel's failure to object to imposing on Bucci a consecutive term of 84 months on Count 3 pursuant to 18 U.S.C. § 924(c)(1)(A)[14] was deficient performance amounting to ineffective assistance of his counsel. Bucci asserts that because his minimum mandatory sentence for combined Counts 1 and 2 was ten years, the "except" clause

---

[14] 18 U.S.C. § 924(c)(1)(A) provides in relevant part:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime –
> . . . (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years . . . .

applied to him, and the consecutive term ought not have been imposed at all.  Bucci's Mem. 84.

Bucci is mistaken as to applicable precedent.  In <u>United States</u> v. <u>Parker</u>, 549 F.3d 5 (1st Cir. 2008), Parker was subject to a mandatory minimum ten-year sentence based on the drug convictions and presented the very same argument Bucci does in the instant case.  <u>Parker</u>, 549 F.3d at 11.  There, the First Circuit stated, "[s]ection 924(c) dictates an additional minimum sentence for an underlying offense **because** of the presence of the firearm; thus, if 'a greater minimum sentence is otherwise provided' **on account of the firearm**, then under the 'except clause' that greater minimum might supercede the otherwise applicable section 924(c) adjustment."  <u>Id.</u> (emphasis in original).  Moreover, the First Circuit distinguished the Second Circuit case <u>United States</u> v. <u>Whitley</u>, 529 F.3d 150 (2d Cir. 2008) in which Whitley was subject to a fifteen-year mandatory minimum sentence for possession of a firearm in the course of the robbery.  The <u>Parker</u> court noted that in such circumstances, imposing a consecutive sentence of ten years pursuant to 18 U.S.C. 924(c) would result in a double increment for "discharge of **the same gun** in the same robbery" – the very situation the Congress wanted to avoid by use of the "except" clause.  <u>Parker</u>, 549 F.3d at 11.

Furthermore, in <u>United States</u> v. <u>Pulido</u>, 566 F.3d 52, 65, n.6 (1st Cir. 2009) the First Circuit confirmed the validity of <u>Parker</u> and rejected the reasoning of the Second Circuit in <u>United</u>

26

<u>States</u> v. <u>Williams</u>, 558 F.3d 166, 168 (2d Cir. 2009) which held that the "except" clause was applicable "where the defendant is subject to a longer mandatory minimum sentence for a drug trafficking offense."

Bucci's counsel's failure to object to the imposition of the consecutive term was not deficient performance and, therefore, Bucci's ineffective assistance claim fails.

## III. CONCLUSION

None of Bucci's claims establish that a violation of the federal constitution or laws occurred in his case.  Therefore, Bucci's petition is DENIED.  For all the same reasons, Jordan's petition is DENIED.


SO ORDERED.


By the Court,


/s/ William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE